UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
HARRIET COOPER,

                       Plaintiff,

                - against -

NEW YORK STATE NURSES ASSOCIATION,
LORRAINE SEIDEL, and SUSANNE CALVELLO,

                    Defendants.
-------------------------------------------------------------X

**MEMORANDUM AND ORDER**
09-CV-3135 (DRH) (ARL)

**APPEARANCES:**

**Attorneys for Plaintiff**
ERIC I. PRUSAN, ESQ.
200 Old Country Road
Suite 680
Mineola, New York 11501
By:    Eric I. Prusan, Esq.

**Attorneys for Defendants**
McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
88 Pine Street
New York, New York 10005
By:    Richard S. Mills, Esq.
        Margaret L. Watson, Esq.

**HURLEY, Senior District Judge:**

       Plaintiff Harriet Cooper commenced this action against her former employer New York

State Nurses Association ("NYSNA") and former supervisors Lorraine Seidel and Susanne

Calvello alleging that her employment was terminated in retaliation for her taking a medical

leave pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*

("FMLA").  Plaintiff also assert retaliatory discharge and hostile work environment claims under

the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.* ("NYHRL").  Both

parties have cross-moved for summary judgment.  For the reasons set forth below, defendants'

motion is granted in part and denied in part, and plaintiff's motion is denied.

## BACKGROUND

### I. The Parties

Plaintiff was employed by NYSNA between July 1993 and April 29, 2009. NYSNA is a dual purpose organization that serves as both a professional association and a labor union for nurses. The division of NYSNA that serves as a union is known as the Economic and General Welfare ("E&GW") Program. Beginning in September 2000, plaintiff worked as an Associate Director for the E&GW Program. In that capacity, plaintiff was considered an at-will, management-level employee. Plaintiff held the Associate Director position until her termination on April 29, 2009.

Calvello is a Senior Associate Director in E&GW. Calvello was plaintiff's direct supervisor at the time of plaintiff's termination in April 2009. Seidel is the Program Director for E&GW and was Calvello's direct supervisor at all relevant times. Seidel reported to non-party Tina Gerardi, NYSNA's Chief Executive Officer.

### II. Structure of the E&GW Department

As an Associate Director, plaintiff was a member of the E&GW Leadership Team. As of November 2008, the Leadership Team consisted of 13 people: the Program Director (Seidel), two Senior Associate Directors (including Calvello) and 10 Associate Directors (including plaintiff). From 2007 through December 2008, plaintiff reported to non-party Barbara Conklin. Then, from early December 2008 through April 29, 2009, plaintiff began reporting to Calvello, although for a large portion of this time plaintiff was out of work on FMLA leave.

2

### III. NYSNA's Operations in 2008 and Plaintiff's Performance

In 2008, NYSNA began to face stiff competition from a rival union, and lost two decertification campaigns – one at Peninsula Hospital and one at Southampton Hospital. Given these defeats, as well as additional ongoing decertification attempts at sixty other NYSNA facilities, "NYSNA leadership saw the organization as in crisis." (Defs.' 56.1 ¶ 11.) In response, the E&GW leadership decided to "raise the bar" in terms of staff and leadership performance, and began to focus on team-building and reducing "dysfunction" within the team. (*Id.* ¶ 12.)

According to defendants, plaintiff began to demonstrate performance problems in 2008. Specifically, plaintiff was criticized for ineffectively communicating with her supervisors, displaying resistance to organizational change, and demonstrating an unwillingness to discipline her staff. (*Id.* ¶ 14.) Defendants assert that they verbally communicated these issues to plaintiff in 2008. Plaintiff disputes the veracity of defendants' claims about her performance issues. In particular, plaintiffs asserts that she was "assigned late to the decertification occurring [at the Peninsula Hospital] in April 2008 as a last ditch effort to try and prevent it," even though NYSNA leadership was not optimistic about avoiding a decertification. (Pl.'s Response to Defs.' 56.1 ¶ 14.) Plaintiff believed that the Peninsula Hospital decertification campaign was a pivotal point in her career, and that Seidel and others wrongly blamed her for the outcome. (Defs.' 56.1 ¶ 15.)

### IV. The Events of November and December 2008

On November 6 and 7, 2008, the E&GW Leadership Team held a two-day meeting in Mohonk, New York. Defendants assert that during this meeting, plaintiff indicated her unwillingness to "be 'all-in'" with the Leadership Team's initiative, and "showed resistance to

any change." (Defs.' 56.1 ¶ 16.) Plaintiff disputes this assertion, and contends that she did not have any discussions regarding the concept of being "all in" until her return from FMLA leave in March 2009. (Pl.'s Dep. at 63.)

In early December 2008, Calvello became plaintiff's supervisor. Almost immediately, Calvello directed plaintiff to relieve Janet Colding-Brown, an individual who reported to plaintiff, of her duties. Defendants assert that plaintiff "showed extreme resistance to that directive," (Defs.' 56.1 ¶ 18), and plaintiff does not dispute that she believed that terminating Colding-Brown's assignment would violate both defendants' ethics policies and her own moral beliefs. (Pl.'s Response to Defs.' 56.1 ¶ 18.) Plaintiff terminated Colding-Brown's assignment anyway for fear that her own employment would be terminated for insubordination if failed to do so. (*Id.*)

Another Leadership Team meeting was held on December 18, 2008 and lasted into the early morning hours of December 19, 2008. Defendants contend that during this meeting, plaintiff informed the Leadership Team that she had scheduled time off to attend a wedding on a date that conflicted with an upcoming two-day team-building retreat. (Defs.' 56.1 ¶ 20.) According to defendants, this set off a lengthy discussion by the Leadership Team about "the broader issue of whether Plaintiff was 'all-in' with the Team.'" (*Id.*) Plaintiff asserts that her vacation time had already been approved, but "was brought up as a topic [of discussion] for the entire leadership team." (Pl.'s Response to Defs.' 56.1 ¶ 20.) Ultimately, the retreat was rescheduled to accommodate plaintiff's vacation schedule.

## V.     *Plaintiff's Medical Conditions and FMLA Leave*

Plaintiff testified that she began experiencing heart palpitations, a loss of appetite, and

insomnia as early as November 2008. (Pl.'s Dep. at 88.) On December 19, 2008, plaintiff telephoned Calvello to report that she was going to be out sick for the day, to which Calvello replied "okay." (*Id.* at 93.) Plaintiff saw both her internist and her cardiologist that day and was diagnosed with tachycardia – an elevated blood pressure. (*Id.* at 89.) At her internist's suggestion, plaintiff subsequently visited a psychiatrist, Dr. Stanley M. Hertz, for an initial consultation to discuss her symptoms. (*Id.* at 94.) The psychiatrist prescribed donazepam and "Prozac-like medications," (Decl. of Margaret L. Watson, Esq., dated Feb. 11, 2011 ("Watson Decl."), Ex. N at 1), and encouraged plaintiff to see a therapist. (Pl.'s Dep. at 95.) Thus, plaintiff began treatments with Mr. Lovens, a therapist. Both Dr. Hertz and Mr. Lovens diagnosed plaintiff as suffering from a "major depressive disorder." (*See* Lovens Dep. at 37; Watson Decl., Ex. N at 3.)

Plaintiff remained out of work between December 19, 2008 and March 3, 2009. She requested and was granted FMLA leave for that period of time. (*See* Aff. of Kim Roberts, dated Jan. 28, 2011 ("Roberts Aff.") ¶¶ 3-4.) The parties do not dispute that defendants did not interfere in any way with plaintiff's ability to take this FMLA leave. Defendants have also proffered undisputed evidence that since 2000, five other members of the E&GW Leadership Team – including Seidel – have requested and received an FMLA leave of absence. (*Id.* ¶ 5.) Three of those five (including Seidel) are still employed by NYSNA, while the other two have retired. (*Id.*)

## VI. *Plaintiff's Co-Workers' and Supervisors' Reactions to her FMLA Leave*

On January 22, 2009, while plaintiff was out on FMLA leave, Kim Roberts, the Director of Human Resources for NYSNA, circulated an email to Seidel, Calvello, Conklin, and Gerardi

advising them that plaintiff would not be returning to work until March 2, 2009. (Watson Decl., Ex. I.) That same day, Seidel sent an email to Gerardi that stated as follows:

> I would like us to take a look at what [plaintiff] has on the books and possibly consider a severance pkg we may want to offer her. I know we cannot terminate her[,] but if we buy out her time, she is likely to just go. This is so unacceptable and not good for the team or our ability to cover assignments. I know you know that.

(*Id.*) During her deposition, Gerardi testified that Seidel, Calvello, and others in the E&GW Leadership Team had expressed concern "about the amount of work that needed to be done while [plaintiff] was gone." (Gerardi Dep. at 51.) Gerardi further testified that Seidel had opined to her that plaintiff was not really sick, and that she (Seidel) was concerned that plaintiff and other staff members were "using LOAs as a way not to be involved in a lot of the work of the association." (*Id.* at 52.) Finally, Gerardi testified that Seidel had "admitted" feeling "betrayed" that plaintiff took FMLA leave. (*Id.* at 91.)

Seidel testified during her deposition that she sent the January 22, 2009 email to Gerardi because "it had been increasingly apparent to [her] well before [plaintiff's] leave that [plaintiff] was not buying into the ideology and direction and the team and was not happy working at NYSNA." (Seidel Dep. at 72-73.) Under those circumstances, Seidel thought "the most compassionate approach" would be to offer plaintiff a severance package. (*Id.* at 73.) Seidel testified that she did not feel "betrayed by [plaintiff] going out on leave." (*Id.* at 82.)

During her deposition, Calvello testified that other Associate Directors on the E&GW Leadership Team felt betrayed by plaintiff taking FMLA leave because they had to take on extra work during that period. (Calvello Dep. at 39-41.) Conklin testified that members of the Leadership Team were "disappointed with Harriet," but "not for taking leave." (Conklin Dep. at

74.)

## VII.   *Plaintiff's Return to Work*

Plaintiff returned to work on March 3, 2009.  Upon plaintiff's return, Seidel convened a meeting with plaintiff, Calvello, and Conklin, purportedly to offer plaintiff ways to assist her with "rebuilding [her] relationship with the team."  (Seidel Dep. at 91.)  According to Seidel, the E&GW Leadership Team had "lost all confidence" in plaintiff because of "her performance and her failure to sign on to the team's ideology" during the November and December 2008 meetings.  (*Id.* at 82-83.)  Seidel testified during her deposition, however, that she also told plaintiff "that the team's perception was that they felt betrayed by her going out on leave."  (*Id.* at 82.)  Plaintiff confirms that Seidel informed her during this meeting that "the team felt that I bailed out and betrayed them," and that "it was up to [plaintiff] to regain trust of the team."  (Pl.'s Dep. at 65-66.)  Seidel offered plaintiff the services of Robin Perry, an outside team-building consultant, and plaintiff subsequently met with Perry.

Upon plaintiff's return to work she held the same Associate Director title but was given a "completely new assignment," which entailed the "same responsibilities, just new facilities, [and a] new staff."  (*Id.* at 101.)  Plaintiff testified that she was told "there had been a lot of changes since [she had] been gone," but these changes were not explained to her.  (*Id.* at 101-02.)  Instead, when she made a mistake she would receive a "we don't do that anymore kind of E-mail."  (*Id.* at 102.)

## VIII.   *Plaintiff's March 2009 Performance Review*

Defendants assert that in early March 2009 – approximately nine days after she returned from FMLA leave – plaintiff was informed that she would be having her bi-annual performance

review.  According to defendants, although plaintiff was supposed to submit a self-evaluation in advance of the evaluation meeting, plaintiff submitted a response to her April 4, 2007 performance review.  (Defs.' 56.1 ¶ 28; *see also* Watson Decl., Ex. H at 1.)  Plaintiff asserts that she misunderstood what was required of her at that time.  (Pl.'s Dep. at 102-05.)

On March 12, 2009, plaintiff met with Conklin and Calvello for her performance evaluation.[1]  The written evaluation documented several performance deficiencies including a reluctance to discipline her staff members, (*see* Watson Decl., Ex. H at 1), engaging in inappropriate "negative non-verbal communication (rolling of eyes, shaking of head)," (*id.* at 2), and "inconsistent" work on certain NYSNA initiatives (*id.* at 3).  The written evaluation also documented plaintiff's "difficulty with communication during the Peninsula decertification campaign.  (*Id.* at 5.)  The written evaluation concluded by setting forth numerous goals and objectives for plaintiff to meet and recommended that plaintiff be subjected to an additional re-evaluation in one year.  (*Id.* at 8.)  Plaintiff claims that "these alleged problems were fictitious and all part of the pretext," and that subjecting plaintiff to another review in one year (rather than two) violated "defendants' policies."  (Pl.'s Response to Defs.' 56.1 ¶ 29.)

## IX.   *Plaintiff's April 22, 2009 Written Warning*

On April 22, 2009, Calvello and Conklin met with plaintiff and issued her a written warning based upon "[i]nsubordination," and plaintiff's failure to communicate and respond to her supervisor, as well as her failure to follow established policies/procedures, and to participate in "supportive team behavior."  (Watson Decl., Ex. J.)  Calvello prepared the warning with input

---

[1]      Although Calvello was plaintiff's supervisor as of the date of the performance evaluation, Conklin was present at the meeting because she served as plaintiff's supervisor for most of the evaluation period.  (Calvello Dep. at 65.)

from Conklin and possibly Seidel. (*See* Calvello Dep. at 75-77; Conklin Dep. at 77.) Although Conklin testified during her deposition that the insubordination charge was based upon plaintiff's failure to respond to certain of Calvello's requests for information, (Conklin Dep. at 79), Calvello had no recollection as to the basis for that charge (Calvello Dep. at 123-24.) The written warning set forth that a follow-up meeting would be held in two weeks. Plaintiff refused to sign the written warning.

## X.    *Plaintiff's Termination*

The following day, April 23, 2009, plaintiff asked Calvello to reconsider a decision that Calvello had made in January 2009, when she denied a request for compensatory time off that had been made by Glennie Millard (an employee who reported to Calvello in January 2009 and began reporting to plaintiff in March 2009). At Calvello's request, plaintiff brought the issue up at the next Leadership Team meeting. When plaintiff broached the subject, Calvello asked plaintiff if Millard was aware that plaintiff was making this request for reconsideration on her behalf. (*See* Calvello Dep. at 127-28.) According to Calvello, she asked plaintiff three separate times: "Does Glennie know that you are bringing this to me, to the team, to anybody?" (*Id.* at 127.) Calvello testified that plaintiff answered "no" each time. (*See id.*)[2] Subsequently, however, Calvello learned that, contrary to plaintiff's representations to the Team, plaintiff had,

---

[2]    During her deposition, plaintiff was asked: "Did the leadership team ask you whether you had told Glennie that you were going to raise the issue with them?" (*See* Pl.'s Dep. at 159.) It appears, however, that plaintiff did not entirely understand the thrust of the question, and so she never provided an answer. (*See id.* at 159-61.) In her motion papers, plaintiff appears to take issue with the semantics of Calvello's position that plaintiff had lied to her during the meeting. (*See* Pl.'s 56.1 ¶ 31.) To the extent the Court credits plaintiff's assertion, it does not change the ultimate outcome of the case, but simply creates another question of fact for the jury decide.

in fact, told Millard that she intended to ask Calvello to reconsider the decision. (*See id.* at 128.)

On April 29, 2009, Calvello advised Seidel and Gerardi "that plaintiff had lied about the Glennie Millard issue." (Defs.' 56.1 ¶ 38.) Gerardi discussed the issue with Seidel and, at Seidel's recommendation, Gerardi terminated plaintiff's employment. (Gerardi Dep. at 83-84, 104.)

Plaintiff's termination letter, written by Gerardi and dated April 29, 2009, provided, in relevant part:

> It is my understanding that your supervisor has begun progressive discipline for performance issues. Not withstanding [sic] that process, I have been informed of an incident in which you lied to your supervisor and other members of the E&GW leadership team.
>
> You are being terminated effective immediately for just cause for insubordination as evidenced by your lying to your supervisor and members of the E&GW leadership team.

(Watson Decl., Ex. K.)

## DISCUSSION

### I.    Legal Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's

burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Bd. of Elections of the City of New York*, 224 F.3d 149, 157 (2d. Cir. 2000), and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

## II. *Plaintiff's FMLA Retaliation Claim*

Plaintiff's FMLA retaliation claim is analyzed under the familiar burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Potenza v.*

*City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). To establish a prima facie case of retaliation, plaintiff must show: "1) [she] exercised rights protected under the FMLA; 2) [she] was qualified for [her] position; 3) [she] suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Id.*

If plaintiff establishes her prima facie case, "then the burden of production shifts to the employer to demonstrate a legitimate, non-discriminatory reason for the adverse employment action." *Shah v. Eclipsys Corp.*, 2010 WL 2710618, at *11 (E.D.N.Y. July 7, 2010) (citing *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 203 (S.D.N.Y. 2009)). If defendants meet this burden of production, "then the plaintiff must establish that the employer's proffered reason was merely a pretext for a discriminatory reason." *Id.* "To satisfy this burden, the plaintiff may rely on evidence presented to establish the *prima facie* case, as well as additional evidence, which may include direct or circumstantial evidence of discrimination." *Lee v. Heritage Health & Hous., Inc.*, 2009 WL 3154314, at *9 (S.D.N.Y. Sept. 30, 2009).

### A.     *Prima Facie Case*

The first, second, and fourth elements of the prima facie case are at issue here.[3]

#### 1.     <u>The First Element</u>

Defendants argue that plaintiff has not shown that she exercised any right protected under the FMLA because neither of her medical conditions met the statutory definition of a "serious

---

[3]     The parties do not dispute that plaintiff's termination constituted an adverse employment action in satisfaction of the third element.

health condition."[4]  (*See* Defs.' Mem. at 11-12.)  The cases cited by defendants in support of their position, however, largely deal with FMLA interference claims, which are analyzed under a different legal standard than FMLA retaliation claims.[5]  More importantly, these cases are factually distinguishable in that they involve defendant-employers that never made affirmative representations that their respective employees were approved to take FMLA leave in the first instance.  *See Lee*, 2009 WL 31354314, at **3, 11, 13-14 (employee took sick leave but never formally requested leave under the FMLA; employer successfully defeated FMLA interference claim by showing that employee did not suffer from a "serious health condition"); *Boyce v. N.Y. City Mission Soc'y*, 963 F. Supp. 290, 293, 298 (S.D.N.Y. 1997) (employee simply "left work" and was later placed on paid leave of absence pending employer's investigation of insubordination charges).  Here, by contrast, it is undisputed that plaintiff applied for FMLA leave and that her FMLA leave request was approved.  Defendants have provided no legal authority to support their argument that under such circumstances they may now argue that her underlying medical conditions did not qualify for FMLA protection as part of their attempt to

---

[4]        The FMLA entitles an eligible employee to take up to twelve weeks of leave per twelve-month period because of a "serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11)(A)-(B).

[5]        "To make out a *prima facie* case on a claim for interference with FMLA rights under 29 U.S.C. § 2615(a)(1), a plaintiff must establish five elements: (1) that she is an eligible employee under the FMLA; (2) that defendant is an employer as defined in the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to the defendant of her intention to take leave; and (5) that she was denied benefits to which she was entitled under the FMLA."  *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004) (internal quotation marks and alterations omitted).

14

undermine plaintiff's prima facie case of retaliation. Indeed, in *Murphy v. FedEx National LTL, Inc.*, a case relied upon by defendants on this point, the Eighth Circuit held: "[A]n employer who makes an affirmative representation that an employee reasonably and detrimentally believed was a grant of FMLA leave can be estopped from later arguing that the employee was not in fact entitled to that leave because she did not suffer a serious health condition." 618 F.3d 893, 899-900 (8th Cir. 2010).[6]

Accordingly, because defendants granted plaintiff's request for FMLA leave, they are estopped from asserting that she did not have a serious health condition. Plaintiff has established the first element of the prima facie case.

## 2.    <u>The Second Element</u>

Defendants assert that plaintiff was not qualified for her position because she consistently failed to perform up to the "enhanced standard" set by the E&GW Directors. (Defs.' Mem. at 13.) The Second Circuit has made clear that "the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he 'possesses the basic skills necessary for performance of [the] job.'" *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) (quoting *Owens v. N.Y. City Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)) (alteration in the original). "[P]laintiff's burden is not to show

---

[6]    Defendants rely on the following statement by the Eighth Circuit in *Murphy*: "Although employers should be wary of the consequences of failing to take advantage of the FMLA's certification procedures, an absolute waiver of the right to challenge the existence of an FMLA-qualifying condition is not one of those consequences." *Murphy*, 618 F.3d at 902. (*See* Defs.' Mem. at 11 n.4.) This statement came in the context of the Eighth Circuit's waiver analysis. The issue of waiver arises in "[a] case in which an employer takes no action to certify an employee's FMLA request, thereafter fires the employee, and then challenge the employee's entitlement to FMLA leave." *Murphy*, 618 F.3d at 899 n.3. Here, as noted above, defendants affirmatively approved plaintiff's FMLA leave and, therefore, the issue of waiver is inapplicable.

good performance or even average performance, but merely to show he 'had the basic qualifications to fulfill his position.'" *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 572 (S.D.N.Y. 2010) (quoting *Alam v. HSBC Bank USA*, 2009 WL 3096293, at *8 (S.D.N.Y. Sept. 28, 2009)). It would be "error to find that plaintiff has not established his *prima facie* case merely because [the] employer was dissatisfied with plaintiff's performance." *Chukwurah v. Stop & Shop Supermarket Co., LLC*, 354 Fed. Appx. 492, 494-95 (2d Cir. 2009); *see also Slattery*, 248 F.3d at 92 (finding district court committed "error" by holding "that because [the employer] was dissatisfied with Slattery's work performance, Slattery had not established the second element of a *prima facie* claim").

Where, as here, "discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." *Slattery*, 248 F.3d at 92 (citing *Gregory v. Daly*, 243 F.3d 687, 695-96 (2d Cir. 2001)). The undisputed evidence before the Court is that plaintiff was employed by the NYSNA for approximately 16 years prior to her discharge. Accordingly, plaintiff has established the second element of her prima facie case.

### 3.     The Fourth Element

The Second Circuit has made clear that "[p]roof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment . . . ." *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987). Here, plaintiff was terminated less than two months after returning from her FMLA leave. The Court finds that plaintiff's evidence of close temporal proximity between her FMLA leave and her termination is sufficient to establish the fourth element of her prima facie case. *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001) ("The causal connection needed for proof of a

16

retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."); *Shah*, 2010 WL 2710618 at *11 (assuming *arguendo* that plaintiff established a prima facie case when "she was terminated only five days after she requested FMLA leave"); *Gordon*, 2008 WL 924756 at *11 ("[T]he temporal proximity of plaintiff's engagement in a protected activity . . . with defendants' decision to fire her can be sufficient in and of itself to establish a causal connection.").

Defendants cited the Second Circuit's decision in *Slattery v. Swiss Reinsurance America Corp.* for the proposition that "where timing is the only basis for a claim of retaliation, and gradual adverse actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." 248 F.3d at 95. Defendants argue that "where, as here, an employee's pre-leave conduct was the impetus for a chain of events that ultimately led to her dismissal, no inference of retaliation arises, even if the timing of the discharge was suspect." (Defs.' Mem. at 15.) Despite defendants' characterization of the record, however, the relevant evidence could be construed by a reasonable juror as demonstrating that plaintiff's pre-leave performance issues were <u>not</u> the "impetus" for her dismissal. Plaintiff's termination letter expressly states that "[n]otwithstanding [the] process" of "progressive discipline for performance issues," which had already begun, plaintiff's employment was "terminated effective immediately . . . for insubordination *as evidenced by your lying to your supervisor and members of the E&GW leadership team*." (Watson Decl., Ex. K (emphasis added).) Because defendants' own evidence could lead a rational jury to conclude that plaintiff's termination resulted solely from her post-leave insubordination and not from her performance problems that began pre-leave, this case is distinguishable from *Slattery*. *Cf. Slattery*, 248 F.3d at 95 (concluding that "adverse employment

actions were both part, and *the ultimate product, of* 'an extensive period of progressive discipline,' which began when [defendant] diminished Slattery's job responsibilities a full five months prior to his filing of the EEOC Charges") (emphasis added, alteration in the original).

Accordingly, the Court concludes that plaintiff has established her prima facie case.

### B.     Defendants' Legitimate, Non-Discriminatory Reason

Defendants have offered a legitimate, non-discriminatory reason for their decision to terminate plaintiff's employment: plaintiff's insubordination "as evidenced by [her] lying to [her] supervisor and members of the E&GW leadership team" in connection with the Glennie Millard incident. (Watson Decl., Ex. K.) Defendants' decision to terminate plaintiff for insubordination is legitimate and non-discriminatory on its face. *See Hines v. City of New York*, 159 F.3d 1346, at *2 (2d Cir. June 23, 1998) (unpublished); *Gordon*, 2008 WL 924756 at *12.

Plaintiff argues that defendants' stated reason for her termination is a mere pretext for retaliatory animus. The Court now turns "to the ultimate question of whether plaintiff has produced evidence from which a jury could rationally find that [defendants] fired her in retaliation for her taking FMLA leave." *See Shah*, 2010 WL 2710618 at *11.

### C.     Pretext

The close temporal proximity between plaintiff's FMLA leave and her termination, without more, "is insufficient to satisfy [her] burden to bring forward some evidence of pretext." *See Simpson v. N.Y. State Dep't of Civil Servs.*, 166 Fed. Appx. 499, 502 (2d Cir. 2006) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998)). As set forth more fully below, the Court finds that the record contains sufficient evidence from which a jury could rationally find that defendants harbored a retaliatory animus when terminating her employment.

This evidence, however, is vigorously disputed – the record is replete with genuine questions of material fact, making summary judgment for either side inappropriate.

Overall, the record evidence could be construed by a reasonable juror as demonstrating that Seidel harbored resentment and some level of animus towards plaintiff because she took FMLA leave. First and foremost is Seidel's January 22, 2009 email, which came on the heels of learning that plaintiff was going to be out on FMLA leave until early March 2009, and in which she states that she "knows we cannot terminate" plaintiff, but proposes that NYSNA simply offer plaintiff a severance package. (Watson Decl., Ex. I.) The email states that "[t]his is so unacceptable and not good for the team." (*Id.*) The unacceptable "this" referenced by Seidel could be construed to refer to plaintiff's FMLA leave – not plaintiff's failure to commit to becoming "all in" with the Leadership Team initiatives.

The record also contains conflicting evidence as to other statements made by Seidel reflecting her resentment and sense of betrayal by plaintiff as a result of her taking FMLA leave. Moreover, the evidence is clear that other members of the Leadership Team felt varying levels of resentment towards plaintiff for taking leave, and that these feelings were communicated to both Seidel and Gerardi. Plaintiff has proffered evidence that when she returned from leave she was informed – in a meeting with both Calvello and Seidel – that her team felt that she "betrayed" them by taking FMLA leave, that her job duties had changed but she was not given clear direction as the new applicable policies and procedures, and that she bore the burden of regaining her teammates' trust.

Finally, the record is undisputed that following a meeting in which plaintiff is alleged to have lied to Calvello, Seidel recommended that Gerardi terminate plaintiff's employment. Given

these facts, the Court finds that a reasonable juror could conclude that defendants' stated reason for terminating plaintiff's employment was a mere pretext for unlawful retaliation.

### III. Plaintiff's State Law Claims

#### A. Plaintiff's NYHRL Retaliatory Discharge Claim is Dismissed

Plaintiff asserts that defendants violated the NYHRL by terminating her employment "in retaliation for taking her FMLA leave." (*See* Compl. ¶¶ 37-42.) The NYHRL prohibits an employer from terminating an employee because of her "age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic victim status." N.Y. Exec. Law § 296(1)(a). An employer also violates the NYHRL by terminating an employee "because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(1)(e).

Defendant argues that a claim that an employee was terminated in retaliation for taking FMLA leave is not cognizable under the NYHRL. (Defs.' Mem. at 19.) "In order to assert a viable claim of retaliatory discharge [under the NYHRL], an employee must demonstrate that there was a reasonable basis to believe that his or her employer engaged in an actionable discriminatory practice and that the employer discharged the employee as a result of the employee's opposition to that practice." *McKenzie v. Meridian Cap. Grp.*, 829 N.Y.S.2d 129, 131 (2d Dep't 2006). Plaintiff argues that she "opposed the way she was treated upon her return from leave when she refused to be 'all in' because she felt she was being thrown under the bus, by objecting to being evaluated nine days after her return to work and refusing to sign her written discipline." (Pl.'s Mem. at 13.) Plaintiff has failed to show, however, that the conduct she

opposed (i.e., her negative treatment and termination following her return from leave) constitutes employment practices forbidden by the NYHRL. Thus, she has failed to demonstrate an essential element of her claim. *See* N.Y. Exec. Law § 296(1)(e) (forbidding retaliation against an employee "because he or she has opposed any practices *forbidden under this article*); *see also McKenzie*, 829 N.Y.S.2d at 131 (dismissing claim that plaintiff was fired in retaliation for requesting additional leave time to accommodate her disability because plaintiff failed to allege "that her request was made in opposition to a practice forbidden by" the NYHRL).

Accordingly, plaintiff's retaliatory discharge claim made pursuant to the NYHRL is dismissed.

### B.    *Plaintiff's NYHRL Hostile Work Environment Claim is Dismissed*

Plaintiff alleges that defendants subjected her to a hostile work environment in violation of the NYHRL. (Compl. ¶¶ 43-48.) In order to bring such a claim, plaintiff must demonstrate that: (1) she is a member of a protected class, (2) she suffered unwelcome harassment, (3) she was harassed based upon her membership in a protected class, and (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment. *See Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)) (applying Title VII standard)[7]; *Quinn v. JPMorgan Chase & Co.*, 2006 WL 1440876, at *3 (N.Y. Sup. Apr. 24, 2006) (applying NYHRL standard); *McIntyre v. Manhattan Ford, Lincoln-Mercury*, 175 Misc.2d 795, 802 (N.Y. Sup. 1997) (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)) (applying NYHRL standard).

_____

[7]    Claims made pursuant to the NYHRL may be analyzed using the standards applicable to claims made under Title VII of the Civil Rights Act of 1964. *See Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 390 n.3 (2004).

As set forth above, plaintiff has failed to demonstrate that, as an individual who took FMLA leave, she is a member of a protected class under the NYHRL. She has also failed to proffer evidence that she was subjected to an environment that was "permeated by discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive" so as to alter the conditions of her employment. *See McIntyre*, 175 Misc.2d at 802.

Accordingly, plaintiff's claim for hostile work environment under the NYHRL is dismissed.

### C.       *Plaintiff's Wrongful Termination Claim is Dismissed*

Plaintiff also asserts that although she "has been at all times ready, willing and able to perform the duties assigned to her by the defendants, but defendants have wrongfully and illegally prevented [her] from doing so." (Compl. ¶ 50.) New York courts have consistently rejected causes of action for wrongful discharge asserted under New York common law. *See Horn v. New York Times*, 100 N.Y.2d 85, 96 (2003) ("We have consistently declined to create a common-law tort of wrongful or abusive discharge . . . ."); *Barcellos v. Robbins*, 858 N.Y.S.2d 658, 660 (2d Dep't 2008) ("New York does not recognize a cause of action for the tort of abusive or wrongful discharge of an at-will employee.

Accordingly, plaintiff's claim for wrongful termination under New York common law is dismissed.

### IV.       *Plaintiff's Claims for Damages*

### A.       *Plaintiff's Claims for Emotional Harm and Punitive Damages are Dismissed*

As set forth above, all that remains at this point is plaintiff's FMLA retaliation claim. Defendants assert that they are entitled to summary judgment dismissing plaintiff's claims for

emotional harm damages and punitive damages because such damages are not recoverable under the FMLA. The statutory language provides that a prevailing plaintiff will be entitled to "damages equal to the amount of any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation," plus interest calculated at the prevailing rate, and liquidated damages in an amount equal to the sum of lost wages plus interest. 29 U.S.C. § 2617(a)(1)(A).

Courts both within and outside the Second Circuit have generally "denied recovery for pain and suffering, emotional distress, or physical injury suffered as a result of an FMLA violation, 'because the FMLA specifically lists the types of damages that an employer may be liable for, and it includes damages only insofar as they are the actual monetary losses of the employee such as salary and benefits and certain liquidated damages.'" *Smith v. Westchester County*, 769 F. Supp. 2d 448, 469 n.23 (S.D.N.Y. 2011) (quoting *Hamilton v. Niagara Frontier Transp. Auth.*, 2008 WL 4724324, at *6 (W.D.N.Y. Oct. 24, 2008)) (collecting cases from outside the Second Circuit). Additionally, "punitive damages are not available under [the] FMLA." *Roff v. Low Surgical & Med. Supply, Inc.*, 2004 WL 5544995, at *10 (E.D.N.Y. Mar. 11, 2004) (citing *Vicioso v. Pisa Bros., Inc.*, 1998 WL 355415, at *4 (S.D.N.Y. July 1, 1998)).

Thus, plaintiff's claims for punitive damages and damages for any pain and suffering, anxiety, or emotional distress experienced by plaintiff are dismissed.

### B. *Plaintiff's Mitigation of Damages*

Defendants assert that plaintiff's remaining claims for damages under the FMLA should be dismissed because she has failed to sufficiently mitigate her damages. (Defs.' Mem. at 22-25.) An individual who prevails on her FMLA claim also has a duty to mitigate her damages.

*See Press v. Concord Mortg. Corp.*, 2008 WL 4727324, at *2 (W.D.N.Y. Oct. 24, 2008); *accord Franzen v. Ellis Corp.*, 543 F.3d 420, 429-30 (7th Cir. 2008). Thus, in order to recover damages under the FMLA, plaintiff must demonstrate that she "attempt[ed] to mitigate her damages by using reasonable diligence in finding other suitable employment." *Dailey v. Societe Generale*, 108 F.3d 451, 455 (2d Cir. 1997) (internal quotation marks omitted). "When deciding whether a plaintiff attempted to mitigate her damages, the 'ultimate question is whether the plaintiff acted reasonably in attempting to gain other employment or in rejecting proffered employment.'" *Arbercheski v. Oracle Corp.*, 650 F. Supp. 2d 309, 313 (S.D.N.Y. 2009) (quoting *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 695 (2d Cir. 1998)).

"Typically, the employer has the burden to demonstrate that suitable work existed in the marketplace and that its former employee made no reasonable effort to find it." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53 (2d Cir. 1998). An employer, however, "is released from the duty to establish the availability of comparable employment if it can prove the employee made no reasonable efforts to seek such employment." *Id.* at 54. "The underlying rationale [for this exception] is that an employer should not be saddled by a requirement that *it* show other suitable employment in fact existed – the threat being that if it does not, the employee will be found to have mitigated his damages – when the employee, who is capable of finding replacement work, failed to pursue employment at all." *Id.*

Defendants argue that plaintiff has "failed, as a matter of law, to meet her burden of demonstrating reasonable mitigation efforts." (Defs.' Mem. at 23.) Plaintiff testified during her deposition that she "could never work for another nurses union because [she] believe[s] so strongly in NYSNA." (Pl.'s Dep. at 165.) She also testified, however, that she applied for a

position with the International Brotherhood of Electrical Workers, and that she has applied for "[a]ll kinds of nursing positions." (*See id.*)  Plaintiff testified that she sent out at least three job applications per week, and has utilized a career center at a New York State Unemployment Office.  (*Id.* at 165-66.)[8]

Based upon this evidence, the Court does not find as a matter of law that plaintiff has failed to meet her burden to mitigate her damages.  Defendants are, however, free to renew their application at the appropriate point during the trial.  Accordingly, that portion of defendants' motion seeking summary judgment based upon plaintiff's failure to mitigate her damages is denied.

---

[8]    In a footnote of their motion papers, defendants point to plaintiff's deposition testimony that she did not maintain copies of every document relating to her job search, and argue that "[a]t minimum, Plaintiff's spoliation warrants a determination that the jobs plaintiff sought as evidenced by the missing documents did not meet her duty to mitigate."  (Defs.' Mem. at 24 n.10.)  The Court will not address this argument without the benefit of more expanded briefing by the parties.  Defendants are free to renew this argument as part of a pre-trial or *in limine* motions.

*CONCLUSION*

For the reasons set forth above, defendants' motion for summary judgment is granted to the extent that plaintiff's retaliation and hostile work environment claims under the NYHRL and plaintiff's common-law wrongful discharge claim are dismissed. Defendants' motion seeking dismissal of plaintiff's FMLA retaliation claim is denied, except that plaintiff's claims for emotional distress and punitive damages claims are dismissed. Plaintiff's motion for summary judgment is denied. The parties are directed to contact the Court within thirty days of the date of this Order to schedule a date for a Final Pre-Trial Conference.

**SO ORDERED.**

Dated: Central Islip, New York
        March 16, 2012                            _____/s/_____
                                                  Denis R. Hurley
                                                  Unites States District Judge